# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

## No. ACM 39627

———————————

### UNITED STATES
*Appellee*

**v.**

### Damon P. LINCK
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 25 August 2020

———————————

*Military Judge:* L. Martin Powell.

*Approved sentence:* Dishonorable discharge, confinement for 7 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 19 October 2018 by GCM convened at Shaw Air Force Base, South Carolina.

*For Appellant:* Major M. Dedra Campbell, USAF; Major Rodrigo M. Caruço, USAF; Catherine M. Cherkasky, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Senior Judge MINK and Judge ANNEXSTAD joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

KEY, Judge:

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of two specifications of rape, one specification of sexual assault, and three specifications of aggravated sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

On appeal, Appellant raises two issues. He asserts the evidence was legally and factually insufficient to support a finding of guilt and that the military judge erred by denying the Defense's request for the appointment of an expert consultant in the field of toxicology. Although not raised by Appellant, we consider whether he is entitled to relief for facially unreasonable post-trial delay. Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and the sentence.

## I. BACKGROUND

All six specifications in this case arise from an alcohol-fueled night of sexualized partying by a group of Airmen which included Appellant and the victim, Senior Airman (SrA) JC.[2]

The series of events at issue began on 9 September 2017 with a party hosted by SrA JT at his off-base residence to celebrate either SrA JT's birthday or an incoming hurricane.[3] SrA JT and SrA JC were close friends who had previously been romantically involved, and SrA JC was the first person to arrive for the party. SrA JC, who had recently separated from her on-and-off boyfriend, Staff Sergeant (SSgt) ZC, brought an air mattress and change of clothes with her along with some food she had prepared, a six-pack of beer, and a bottle of wine.

While waiting for the other party invitees to arrive, SrA JC took a picture of herself lying in a hammock at SrA JT's house and posted it to her Facebook

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] By the time of trial, Senior Airman (SrA) JC had been promoted to staff sergeant. We refer to her by the grade she held at the time of the offense.

[3] As with many aspects of the case, witnesses offered varying accounts on this point.

feed.[4] Appellant, whom SrA JT had also invited to the party but had not yet arrived, sent SrA JC a message via Facebook Messenger shortly after 2000 hours reading, "Totally jealous of the hammock."[5] SrA JC responded, "Get ya a** over at [SrA JT's] then." Appellant said he was waiting on his ride to which SrA JC replied, "Its dark now so not as pretty . . . Happy birthday btw!" and "See ya in a bit" followed by a smiling emoji.

Eventually, Appellant arrived at SrA JT's party, driven there by his designated driver, SrA DV. Other invitees also showed up, to include SrA MM, who drove herself and Airman First Class (A1C) RH to the party. Once at SrA JT's house, the Airmen began playing drinking games, some with sexual themes. SrA JC recounted drinking the entirety of the six-pack of beer she had brought, another can of beer, and "a shot" of high-proof liquor—substantially more than SrA JC said she would ordinarily consume in a single setting. As time went on, more people began showing up at the party, interfering with the drinking games.

At 2219 hours, about two hours and twenty minutes after Appellant sent his comment about the hammock to SrA JC—presumably the approximate timeframe in which SrA JC drank the aforementioned quantity of alcohol—Appellant sent a group text message to his designated driver, SrA DV, and SrA MM asking, "Is this too many people for anyone else?" Appellant and A1C RH were apparently standing together at the time, and Appellant was sending messages on behalf of A1C RH as well as himself. SrA DV responded that she could leave whenever Appellant and A1C RH wanted to leave, and Appellant replied, "I wanna bring [SrA JC] with us." This prompted SrA DV to ask, "Um, is that [Appellant] or [A1C RH] trying to bang [SrA JC] lol." Appellant texted back, "Yes."

This group of six Airmen—Appellant, SrA JC, SrA MM, SrA DV, A1C RH, and the host of the original party, SrA JT—left for Appellant's apartment, about a 15-minute drive away. SrA JC brought her air mattress, clothes, and bottle of wine with her. SrA JT drove SrA MM's car and SrA DV drove her own car. SrA DV testified SrA JC rode in her car and that SrA JC "kept going on about her ex-boyfriend" for "[p]retty much the whole car ride" without any prompting or encouragement from SrA DV. A few minutes after the group arrived at Appellant's house, SrA DV left, having fulfilled her designated-driver obligations.

---

[4] SrA JC declined to provide investigators access to her phone and only turned over tailored screenshots. As a result, the record contains neither the hammock picture nor any caption SrA JC may have posted along with it.

[5] Except as otherwise indicated, we quote all text and online messages verbatim.

The remaining five Airmen continued drinking and playing sex-themed games, although what they drank and in what quantity is indiscernible from the record. For example, SrA JC said she believed she consumed most of the bottle of wine she brought, which she identified as a four-liter bottle of sangria, although she largely based that belief on seeing a near-empty bottle the next morning. SrA JT, on the other hand, said the bottle of wine was the size of a standard 750-milliliter bottle, and he drank two-thirds of it, with SrA JC consuming the remainder.

For reasons the Airmen could not recall at trial, the group decided to take off their pants and continue playing a board game in Appellant's living room. At some point, SrA JC leaned over to SrA MM and said something to the effect that SrA JC could guess SrA MM's sexual fetishes, leading SrA JC to kiss SrA MM on her neck and then start "making out" with her. As they continued kissing, Appellant and A1C RH moved in closer and began touching and grabbing both SrA JC and SrA MM. This led to SrA JC's and SrA MM's underwear coming off and Appellant digitally penetrating and performing oral sex on both of them, alternating between the two women. While Appellant was doing this, A1C RH was leaning over Appellant with his left hand on SrA MM's neck, choking her but not so aggressively as to cut off her air supply. A1C RH used his other hand to choke SrA JC with a dog leash that had come to be attached to her neck.

As these events unfolded, SrA JT became uncomfortable and retreated to Appellant's bathroom to see if he could figure out a way to have someone come pick him up and drive him home. Unsuccessful, he returned to the living room where SrA MM was naked and Appellant was continuing to perform oral sex on her and SrA JC while A1C RH was choking the two. SrA JT noticed SrA JC looked as if she was "becoming unresponsive," so he pushed A1C RH out of the way and took off the leash. Appellant and A1C RH turned their focus to SrA MM. Shortly thereafter, Appellant pushed A1C RH away and told SrA MM, "Let's go into the bedroom." SrA MM then pushed Appellant back, stood up, and loudly announced, "Gotcha b***h," which was her way of communicating that she did not intend to go to Appellant's bedroom with him. She described Appellant as looking "really angry" after she did so.

While SrA MM started getting dressed, SrA JC rolled over onto SrA JT, who was sitting on the couch next to her, and briefly kissed him until he rolled her off to his other side. As SrA MM, SrA JT, and A1C RH all prepared to leave, SrA JC—wearing only her shirt—remained on the couch refusing their offers for rides home or for water or food. At trial, SrA JC testified she wanted to stay and sleep on Appellant's couch out of concern that none of the others was sober enough to drive. She said she clearly remembered telling the group, "you are all drunk and you shouldn't drive . . . there is couches, there's ways for us to

stay the night. We shouldn't drive drunk." SrA JT, however, testified that SrA JC "was ready to go to sleep . . . She didn't want to go anywhere. She just wanted to go to sleep." SrA MM testified that SrA JC "was saying no to everything. I'd offered her a ride and she didn't want to move." SrA MM further testified that SrA JC looked "[p]retty exhausted" and "really out of it." Acquiescing to SrA JC's wishes to remain at Appellant's apartment, SrA MM drove herself and the other two Airmen to their respective homes.

SrA JC testified that after the others left, she fell asleep on Appellant's couch. The next thing she remembered was being in Appellant's bedroom, "handcuffed" to his bed, with Appellant slapping and choking her. She explained she was lying on her back, her hands "were restrained by a Velcro sort of handcuff thing that was connected to the bed," and she was unable to get her hands out of the restraints or out of the bed. Appellant was slapping SrA JC across the face with his hands as well as slapping her vaginal area and choking her. Because her legs were not restrained, Appellant was also able to repeatedly slap her buttocks. Although SrA JC had her shirt on, both it and her bra had been pushed onto her upper chest. SrA JC testified she was screaming, telling Appellant to stop and that it hurt, but Appellant just told her that he liked it when she screamed. She tried kicking Appellant to no avail, and he proceeded to hold down her legs with his hands and arms while he orally and digitally penetrated her.

SrA JC then heard "two very loud knocks," and she told Appellant to go get the door. Appellant released SrA JC from the restraints, and she went into the living room and sat on the couch while Appellant investigated. Concluding no one was at the door, Appellant walked over to SrA JC, picked her up, and carried her back to the bedroom. SrA JC said Appellant resumed choking and slapping her while she continued to kick him. He orally and digitally penetrated SrA JC's vulva again as she tried to push him off in vain. At some point, Appellant backed off and asked SrA JC if she just wanted to go to sleep. She answered in the affirmative, rolled over, and fell asleep, but she woke to Appellant choking and slapping her again, orally and digitally penetrating her again, and finally penetrating her vulva with his penis after which he ejaculated on her shirt and on her side. SrA JC also testified that at some point during the assault, Appellant attempted to penetrate her anus with his fingers.

Once Appellant ejaculated and fell asleep, SrA JC returned to the couch, where she saw that SrA JT had sent her a text at 0110 hours asking, "You okay?" She responded at 0312 hours, "You still upp" and "Pick me up tomorrow as soon as you wake up." She tried calling SrA JT a few minutes later, but he did not pick up, and she did not leave a voicemail message. SrA JC testified she then went to Appellant's bathroom and took pictures of her injuries "just

in case, in the future, if [she] ever need[ed] it as evidence." She tried unsuccessfully to fall asleep on Appellant's couch and started repeatedly calling SrA JT's phone number along with another friend's number at 0505 hours. At 0525 hours, SrA JT called her back, and he picked her up about 30 minutes later. SrA JC did not say anything about the assault during the ride back to SrA JT's house.

SrA JC went to sleep at SrA JT's house. When she woke up around 1100 hours, she told SrA JT over breakfast what had happened at Appellant's apartment after he and the other Airmen had left. She showed SrA JT marks on her neck, hips, buttocks, and face, which SrA JT described as "red marks" but he did "not believe there was any bruising at that point." SrA JT—under the impression he was a mandatory reporter—told SrA JC that she needed to report the assault, and if she did not do so, he would. SrA JC then went to her apartment where she called two military friends of hers, telling one, "I took pictures." Shortly after noon, those two friends came to SrA JC's apartment, and she showed them bruises on her neck and buttocks, as well as redness on her wrists. One of the friends later testified that the injuries on SrA JC's buttocks looked "like when you hit something really hard and the—like the blood vessels are popped underneath the skin." The two friends discussed SrA JC's reporting options with her and helped her contact the base sexual assault response coordinator (SARC) who told SrA JC to go directly to the emergency room. SrA JC did so around 1530 hours, and she underwent a sexual assault forensic exam from which she was not discharged until just before 2100 hours that night. The exam disclosed bruising on SrA JC's neck and buttocks; swelling on her clavicle; abrasions on her chest and genitals; and fissures to her anal folds. The nurse who conducted the exam noted the bruises on SrA JC's buttocks were blue, purple, and red in color, and she testified that the bruises on SrA JC's buttocks and those on her neck had circular patterns which could indicate they were made by fingers. The exam included taking photographs which documented SrA JC's injuries.

Earlier that day at 0900 hours, Appellant sent SrA JC a Facebook Messenger message which asked, "You make it home?" Receiving no response, he sent her two more messages about four hours later. The first read, "So I got a little too drunk last nifgt . . . hope I didn't overstep in boundaries . . . sorry." The second read, "It was a good time though. Thanks for hanging out!" He also sent a text message to SrA MM that said, "My house is now Vegas." Appellant sent SrA JT two messages as well: "My place is Las Vegas" and "Wait did you come back to get [SrA JC]?" The second of these messages arrived on SrA JT's phone just before 1530 hours—about the same time SrA JC was reporting to the emergency room. SrA JT did not respond. Meanwhile, A1C RH sent text mes-

sages to SrA MM that morning trying to make arrangements for him, Appellant, and SrA JC to go to breakfast, but SrA MM did not assist in that endeavor.

In the ensuing investigation, military authorities searched Appellant's apartment pursuant to a search authorization and found a restraint system consisting of straps with Velcro cuffs along with a pair of metal handcuffs with fuzzy purple covers. SrA JC's DNA was found on both the Velcro cuffs and the handcuff covers, although SrA JC said the metal handcuffs were never used on her. Appellant's DNA was found in semen retrieved from SrA JC's vagina during her forensic exam. SrA JC provided investigators a screenshot of the text messages between her and SrA JT and a copy of her call log showing her efforts to reach him in the hours just after the assault.

Appellant was charged with two specifications of rape for orally and digitally penetrating SrA JC's vulva while she was physically restrained, one specification of sexual assault by causing her bodily harm by penetrating her vulva with his penis, and three specifications of aggravated sexual contact by touching her genitalia, buttocks, neck, and face with an intent to gratify his sexual desire while restraining her to his bed.[6]

During Appellant's court-martial, SrA JC testified as to her fragmented memories of the night's events, some of which were more clear than others. She did not remember talking about her ex-boyfriend during the ride from SrA JT's house. She remembered drinking wine at Appellant's apartment, but she did not remember how much she drank or whether she poured it into a cup first or drank straight from the bottle. She remembered the specifics of the assault in Appellant's bedroom, but she did not remember earlier events, such as the group having their pants off, her talking about SrA MM's fetishes, her kissing SrA MM, having a leash attached to her neck, Appellant performing oral sex on her in the group setting, kissing SrA JT, or what SrA MM specifically said when she stood up and refused to go to Appellant's bedroom.

During cross-examination, trial defense counsel challenged SrA JC on her claim that she had taken photographs of her injuries while she was in Appellant's bathroom by pointing out that the background of the pictures depicted SrA JC's own bathroom, not Appellant's. SrA JC admitted she told both the sexual assault nurse examiner and Air Force Office of Special Investigations

---

[6] Once Appellant was convicted, the military judge merged the two rape specifications as well as the three aggravated sexual contact specifications for the purposes of sentencing. This had no impact on the maximum sentence Appellant faced, which included confinement for life without eligibility for parole.

agents that she had taken the pictures at Appellant's apartment immediately after the assault, statements which were false. SrA JC asserted she simply did not recall whose bathroom she took the pictures in. She was further confronted with the fact she had deleted certain text messages before providing screenshots to investigators. SrA JC admitted she deleted a message she sent to SrA JT before going to the emergency room which read, "Im going to talk to a sarc rep but since I already told you want happened you need to keep the sh*t confidential." SrA JC asserted she deleted the message because she was afraid someone might hack into her phone, and she did not want anyone reading that message.

SrA JC testified at trial that the Facebook Messenger exchange between her and Appellant on the day of the party after she posted the hammock picture was the first time she had corresponded with Appellant on Facebook. She said she had not previously interacted with him in any other way. However, trial defense counsel confronted SrA JC with the fact she and Appellant had actually matched with each other via an online dating application just over a month prior to the party, and they had exchanged messages using that platform to include discussing being in the same military unit. This conversation was both brief and prosaic, with neither Appellant nor SrA JC making any suggestive or otherwise noteworthy comments. At some point before the day of the party, they became friends on Facebook. When confronted with the messages she had exchanged with Appellant on the dating application, SrA JC said she had simply forgotten about them.

SrA JC also testified she reunited with her boyfriend, SSgt ZC, a few weeks after the assault, and the two remained together as a couple through the trial.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant argues his conviction is legally and factually insufficient based upon his assertion that SrA JC's testimony is not credible. He identifies four "areas of specific concern": (1) the amount of alcohol SrA JC said she consumed was inconsistent with her conduct; (2) the assault SrA JC described was inconsistent with the injuries documented in her sexual assault forensic exam; (3) SrA JC made false statements about having not interacted with Appellant prior to the night of the party, where she took pictures of her injuries, and her reason for not leaving Appellant's apartment when the others left; and (4) SrA JC had motives to fabricate the allegations. We find Appellant's claims unpersuasive.

### 1. Law

We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order for Appellant to be found guilty of rape as charged here, the Government was required to prove beyond a reasonable doubt that: (1) Appellant committed a sexual act upon SrA JC by penetrating her vulva with a part of his body, (2) he did so with the intent to gratify his sexual desire, and (3) he used unlawful force against her to carry out the attack. *See Manual for Courts-Martial, United States* (2016 ed.) *(MCM)*, pt. IV, ¶ 45.b.(2)(a). "Unlawful force" is defined as "an act of force done without legal justification or excuse," and

"force" includes "the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person." *MCM*, pt. IV, ¶ 45.a.(g)(6), (5). In this case, the unlawful force alleged was Appellant restraining SrA JC to a bed.

For the sexual assault specification, the Government had to prove (1) Appellant committed a sexual act upon SrA JC by causing penetration, however slight, of her vulva with his penis, and (2) he did so by causing bodily harm to her. *MCM*, pt. IV, ¶ 45.b.(3)(b). "Bodily harm" is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." *MCM*, pt. IV, ¶ 45.a.(g)(3). In order to sustain a conviction for aggravated sexual contact, the Government had to prove that (1) Appellant committed sexual contact upon SrA JC by touching parts of her body (here, her genitalia, buttocks, neck, and face), (2) he did so with the intent to gratify his sexual desire, and (3) he used unlawful force against her. *MCM*, pt. IV, ¶ 45.b.(5)(a), (6)(a).

### 2. Analysis

We note at the outset that Appellant, in challenging the military judge's findings, does not specify whether he is contesting his conviction for certain specifications or for all of them. For purposes of our analysis, we will assume the latter.

Having carefully reviewed the evidence in this case in the light most favorable to the Government, we conclude a rational trier of fact could find Appellant guilty of the offenses he was charged with beyond a reasonable doubt. SrA JC testified that Appellant had restrained her to his bed using "a Velcro sort of handcuff thing"—a set of restraints which were subsequently found in Appellant's apartment and which had SrA JC's DNA on them. Moreover, SrA JC testified Appellant engaged in vaginal sexual intercourse with her, and Appellant's DNA was found in semen in SrA JC's body. Taken together, these facts demonstrate the restraints were applied to SrA JC at some point during the night, as well as that Appellant penetrated her vulva with his penis.

Similarly, the fact SrA JC had physical injuries after the encounter is not subject to serious debate. Within a few hours of the assault, SrA JC showed SrA JT red marks on her face, neck, hips, and buttocks. Not much later, she showed her injuries to the two military friends who came to her apartment, one of who described the injuries to SrA JC's buttocks as looking like "the blood vessels [were] popped" like when one hits "something really hard." That afternoon, medical professionals documented injuries to SrA JC's neck, clavicle, chest, buttocks, genitals, and anus, all consistent with SrA JC's description of the assault. Perhaps most compellingly, the photographs taken during the sexual assault forensic exam and which were admitted as evidence in Appellant's court-martial clearly show extensive bruising to SrA JC's neck and buttocks.

The evidence of her injuries, in conjunction with her testimony, establishes that Appellant did apply force and violence to SrA JC's buttocks, neck, and face. Although Appellant was not charged with attempting to penetrate SrA JC's anus with his fingers, the injuries to her anal folds were consistent with such an attempt and further corroborate SrA JC's account of the assault. Considering Appellant had been orally and digitally penetrating SrA JC's vulva when the group of Airmen were still at Appellant's house, it is no great leap to believe Appellant repeated that conduct after they left and Appellant had restrained SrA JC to his bed.

Beyond this physical and scientific evidence and SrA JC's testimony, the text messages Appellant sent SrA DV while they were at SrA JT's house demonstrate it was Appellant's idea to move the group to his apartment and to specifically bring SrA JC, and that either Appellant or A1C RH (or both) wanted to have sex with SrA JC. The next morning, Appellant sent messages to SrA JC and SrA MM describing his apartment as "Vegas," from which a rational factfinder could draw a number of conclusions, for example, that Appellant was saying he got lucky or that what happened at his apartment needed to stay at his apartment. A1C RH's and Appellant's attempt to arrange to go to breakfast with SrA JC may very well have been an effort to assess how much SrA JC remembered or to persuade her not to report the episode. Such a possibility is buttressed by the fact Appellant sent SrA JC a message in the afternoon apologizing and saying, "hope I didn't overstep in boundaries," as well as thanking her "for hanging out." Although these messages and Appellant trying to make breakfast plans could all have innocent explanations, when they are combined with the other evidence in the case, a rational factfinder could conclude they paint Appellant as both setting the stage for the assault and being astutely aware of the liability he faced for his conduct.

Appellant's attacks on appeal are unavailing and do not undermine the evidence in the case in a meaningful way. Appellant argues that SrA JC must have lied about how much alcohol she consumed, because there was "no evidence of . . . physical indicia of the level of intoxication" she claimed. From this proposition, Appellant points to SrA JC's fragmented memory, suggesting SrA JC either fabricated her testimony or deceptively claimed to not remember "information she views as unfavorable to her case." This line of attack misses the mark for several reasons. First, evidence of SrA JC's intoxication was in fact introduced, to include SrA JT's testimony that SrA JC appeared to be "becoming unresponsive" while A1C RH was choking her and SrA MM's testimony that SrA JC looked "[p]retty exhausted" and "really out of it" when the rest of the Airmen decided to go home. Second, the aspects of the evening SrA JC testified she could not recall were described by other witnesses in the case, which is to say that this evidence was introduced regardless of SrA JC's lack of recollection. Thus, SrA JC would have had little ability to shape the evidence in the

case by falsely alleging she did not remember those events. Third, evidence adduced at trial indicate SrA JC's alcohol consumption largely occurred at SrA JT's house in a compressed period of time, approximately between the hours of 2000 and 2200. Thus, a rational factfinder could conclude SrA JC's recollection would have improved with respect to events that occurred later in the night versus those that occurred closer in time to significant alcohol consumption. Such an assessment would be consistent with SrA JC's testimony that she could not remember events in the group setting at Appellant's house, but she could remember details of the assault several hours later. Fourth, because of the absence of any evidence SrA JC consented to the conduct in Appellant's bedroom, her relative degree of intoxication has limited probative value other than to explain her lack of recall. Finally, the evidence of SrA JC's physical injuries and the results of the DNA analysis corroborate her account of the assault entirely independent of her level of intoxication. Thus, even if we were to assume—which we do not—that SrA JC falsely claimed to have consumed more alcohol than she actually did, her in-court testimony is corroborated by other evidence in this case, dramatically reducing the relevance of her actual degree of intoxication. We similarly do not see any purportedly false statements about the amount of alcohol she consumed giving rise to the notion that SrA JC's credibility is so poor that she falsely accused Appellant of violently assaulting her and then falsely testified about it. Instead, a rational factfinder could conclude any inconsistencies in SrA JC's recollection of her precise alcohol intake are little more than the product of the alcohol she did consume.

Appellant's next argument is that SrA JC's injuries, as documented in the written portion of the forensic exam, were "minor" and "cannot be conclusively ascribed to [Appellant]" due to the fact she was also choked by A1C RH. Appellant specifically points to SrA JC's assertion that Appellant slapped her "dozens of times," yet the medical examiner did not document facial injuries and the pictures SrA JC took of herself only showed a slight redness to her face. Appellant's argument stands in stark contrast to the evidence actually adduced in this case which includes medical photographs of substantial bruising to SrA JC's body as well as eyewitness testimony indicating SrA JC's bruises became more pronounced as time passed. Appellant's characterization of SrA JC's injuries as "minor" is also at odds with her medical exam which found widespread bruising to her body and injuries to her genitals and anus. Although there was evidence A1C RH was using a leash to choke SrA JC, she testified Appellant choked her in his bedroom with his hands, an assertion corroborated in part by the nurse examiner's observation of round marks on SrA JC's neck similar to those on her buttocks. Moreover, even if some, or indeed all, of the bruising on SrA JC's neck was caused by A1C RH, such would not absolve Appellant of his criminal culpability for later grasping SrA JC's neck against her will.

Appellant further argues SrA JC has poor credibility based upon her erroneous testimony that she had not previously interacted with Appellant before the day of the party; which bathroom she took photographs of her injuries in; and her reason for not leaving Appellant's apartment with the other three Airmen. In general, these three areas of testimony are peripheral to the charges in this case and they collectively indicate simple mistakes more than they demonstrate intentional dishonesty. To the first point, SrA JC and Appellant were friends on Facebook prior to the party which would explain Appellant responding to her hammock post via Facebook Messenger. SrA JC's telling Appellant to get to the party also demonstrates at least a passing familiarity and level of comfort with Appellant as well her knowledge that he was coming to (or at least welcome at) SrA JT's party. When confronted with the messages she exchanged with Appellant on the dating application, SrA JC readily admitted to the exchange, but said she had forgotten about it. Having reviewed the short and rather mundane conversation from the dating application, we see nothing remarkable, much less unbelievable, about SrA JC forgetting about it by the time of Appellant's court-martial—some 15 months later. Moreover, based upon her familiarity with Appellant and the fact she was friends with Appellant on Facebook, it would be implausible to conclude SrA JC had never interacted with him. Her statement to the contrary could therefore be understood as a mistake rather than an attempt to deceive.

Whether SrA JC took photographs of her injuries in Appellant's bathroom or some other bathroom is somewhat more difficult to reconcile considering SrA JC told investigators and the nurse examiner shortly after the assault she had taken the pictures in Appellant's bathroom. A rational factfinder could conclude she was lying in order to portray the pictures as being taken closer to the assault than they actually were. On the other hand, a rational factfinder could also conclude SrA JC's recollection of where she was when she took the pictures was clouded by her emergence from her drunken state, the stress of the day's events in which she decided to report the assault and undergo a forensic exam, and that she was reeling from the trauma of being violently assaulted just hours earlier. Ultimately, however, where she took the pictures is almost entirely immaterial because she showed the pictures to the nurse examiner during the sexual assault forensic exam the day she reported the assault. SrA JC also told a friend of hers she had taken pictures before noon. Thus, SrA JC seemingly took the pictures at some point between the end of the assault and noon that same day. The forensic photographs taken during her medical exam were significantly more detailed and graphic, so the pictures taken in the bathroom—whichever bathroom it was—had little probative value in comparison. Considering the evidentiary insignificance of the bathroom pictures and the relatively short window of time in which they could have been taken, any false statement about which bathroom the pictures were taken in

was collateral at best and falls far short of indicting SrA JC's credibility with respect to the assault.

Similarly, what precisely SrA JC told the Airmen when they left Appellant's apartment does not call into question SrA JC's credibility in any meaningful way. SrA JC says she told the group they should all stay at Appellant's apartment out of concern for their safety. SrA JT and SrA MM remembered SrA JC wanting to stay on Appellant's couch because she was tired. These two positions are neither inconsistent nor all that different, and, considering all had been drinking, there is nothing particularly notable about the fact the Airmen had different interpretations and recollections of the conversation. In any event, the upshot of the short discussion was that SrA JC did not wish to leave with the other three Airmen, a position all understood.

Appellant's final attack is rooted in the theory that SrA JC had motives to fabricate the allegation Appellant sexually assaulted her. He points to three potential motives, none of which is particularly well-supported by the evidence. First, he argues that because SrA JC had recently broken up with her boyfriend, she was in "an emotionally vulnerable time," and a consensual sexual encounter "could lead to obvious regret and motive to fabricate." As we understand this argument, Appellant is suggesting SrA JC may have felt guilty about having consensual sex with Appellant, so she claimed Appellant assaulted her. Second, SrA JC may have wanted to "avoid trouble" with SrA JT, who was upset that SrA JC did not leave Appellant's apartment with the rest of the group. Third, SrA JC might have been embarrassed by the night's events.

Although SrA JC testified she and her boyfriend, SSgt ZC, had, in fact, broken up again and SrA DV said she spent the car ride to Appellant's house talking about the breakup, there was no evidence SrA JC was "emotionally vulnerable" as a result. Similarly, no evidence was adduced as to when SrA JC next talked to SSgt ZC at all, much less when she told him about the assault. No evidence was offered regarding either SSgt ZC's views on SrA JC engaging in sexual conduct while they were broken up or SrA JC's feelings of guilt (or lack thereof) regarding the same.

Appellant's claim that SrA JC alleged she was assaulted to "avoid trouble" with SrA JT is difficult to comprehend. SrA JT had watched SrA JC kiss SrA MM and then receive oral sex from Appellant, who was also doing the same to SrA MM while A1C RH was leaning over and choking the two women—SrA JC with a leash. Whether or not SrA JC had consensual private sex with Appellant thereafter would seem to be of little consequence. SrA JC also did not immediately tell SrA JT she had been assaulted when he came to pick her up, which undercuts the theory she was trying to avoid upsetting him. Although SrA JT expressed frustration that SrA JC did not leave with the rest of the group and

14

SrA JC perceived he was frustrated when she told him he needed to pick her up early that morning, SrA JC waited to tell him about the assault until later in the morning. There is no evidence SrA JT was still upset when SrA JC woke up; to the contrary, SrA JT made breakfast for the two of them, and SrA JC explained while they ate she had been assaulted, which hardly suggests SrA JC needed to resort to falsely alleging she had been raped to diffuse whatever tension may have existed.

Appellant's third argument as to SrA JC's alleged motives—that she was embarrassed by the sexual conduct in Appellant's bedroom—highlights the fundamental infirmity running through all of Appellant's theories, which is that if SrA JC was so concerned about others' reactions to her private sexual conduct with Appellant, she would have simply said nothing happened or not said anything at all. Appellant himself was seemingly willing to have what happened at his apartment stay at his apartment. Yet, SrA JC reported the assault after a few hours of sleep to SrA JT, then to two of her friends, then to the SARC, and then to the sexual assault nurse examiner, all in the same day as the assault. By doing so, SrA JC guaranteed significant scrutiny of the events of that night, not just by law enforcement and medical professionals, but by her fellow Airmen, her chain of command, and even SSgt ZC. The more plausible explanation is the simpler one: Appellant assaulted SrA JC, and she promptly reported it.

Viewing the evidence in this case in the light most favorable to the Prosecution, we conclude a rational trier of fact could find the essential elements of the offenses Appellant was convicted of beyond a reasonable doubt. The military judge's findings of guilt are therefore legally sufficient. We have taken a fresh and impartial look at the evidence, and we are ourselves convinced, beyond a reasonable doubt, that Appellant is guilty. His conviction is factually sufficient.

**B. Denial of Forensic Toxicologist**

Appellant's defense team was appointed a forensic psychologist, but the military judge denied their motion to appoint a forensic toxicologist, a decision Appellant now challenges on appeal.

**1. Law**

Military members facing court-martial are entitled to government-provided expert assistance when it is necessary to their defense. *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010). In order to be granted such assistance, an accused must demonstrate:

> a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial. To establish the

first prong, the accused must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop.

*United States v. Freeman*, 65 M.J. 451, 458 (C.A.A.F. 2008) (quotation marks and internal citations omitted).

We review a military judge's decision to deny the appointment of an expert for an abuse of discretion, and we will only reverse that decision when the military judge's findings of fact are clearly erroneous or when the military judge has adopted an erroneous view of the law. *See United States v. Lee*, 64 M.J. 213, 217 (C.A.A.F. 2006).

### 2. Additional Background and Analysis

As at trial, Appellant fails on appeal to explain how an expert toxicologist would assist the Defense. Trial defense counsel argued to the military judge that even though the Defense had a forensic psychologist who could assist counsel in understanding alcohol's impacts on memory, that expert could not address the "physical aspect" of intoxication. Trial defense counsel asserted this case involved the "biochemistry" of "the effects of the alcohol on the consciousness," specifically, "what kind of physical effects take place when you consume a particular amount of alcohol, in a particular time period." As we understand the theory advanced at trial, the Defense wished to explore the scientific aspects of a person drinking to the point of passing out, but then later waking up "really quick, fully alert." On appeal, Appellant asserts he was denied the ability to present any evidence of SrA JC's "likely level of consciousness, memory, or the probable physical impact from alcohol," and expert assistance was needed to assess SrA JC's credibility and the "physical possibility of [her] allegations."

In his ruling, the military judge noted there was "ample evidence" as to SrA JC's intoxication. He also pointed out that a toxicologist would be hampered in trying to compute SrA JC's blood-alcohol level given the fact no one could say just how much alcohol she had consumed. The military judge also noted trial defense counsel had failed to point to any scientific literature "or anything that possibly could have been discovered through normal research methods" that would indicate a toxicologist could be helpful under the facts presented here. The military judge also highlighted that the Defense had an appointed forensic psychologist who could assist with memory issues and related alcohol impacts.

We agree with the military judge. At trial, the Defense failed to explain how a toxicologist would assist Appellant and only made vague and generalized claims that such an expert would somehow assist in understanding alcohol's

effect "on the consciousness." Appellant fares no better on appeal, as he still fails to cogently describe the issue he believes a toxicologist would help resolve. As the military judge explained in his ruling, the evidence at trial did not precisely establish how much alcohol SrA JC consumed. Although SrA JC said she drank her six-pack of beer, another can of beer, and a shot of alcohol of an indeterminate size at SrA JT's house, the amount of wine she consumed at Appellant's house is unknown. On appeal, Appellant challenges whether SrA JC actually drank the amount of alcohol she claimed, further obfuscating the matter. Thus, a toxicologist would be left generally explaining the effects of alcohol and how the body metabolizes it without being able to specifically relate those concepts to SrA JC. The utility of such testimony becomes even less clear considering the specifics of this case such as witness testimony as to SrA JC's level of intoxication, which is seemingly superior to an expert's hypothesis as to how drunk she was or was not. Even after those witnesses left Appellant's apartment, SrA JC's testimony is that she fell asleep and woke up to Appellant violently assaulting her, an assault which she describes with relative specificity. We do not understand, and Appellant does not explain, what gap in knowledge with respect to this period of time an expert could fill that would be helpful to the Defense.

Appellant also argued at trial an expert would have assisted the Defense in understanding how SrA JC would wake up "really quick, fully alert" after apparently passing out due to her alcohol consumption. Appellant, however, never established SrA JC woke up "really quick" or "fully alert." Instead, SrA JC's testimony was that the next thing she remembered after going to sleep on the couch was being physically assaulted by Appellant in his bed and her trying to fight him off. SrA JC's formation of memories, however, is not the same as her level of consciousness, and Appellant's assertions about when and how she woke up are not supported by any evidence. Even if Appellant had established that factual predicate, he has not explained how expert assistance on this point could assist in his defense. As such, Appellant failed to meet his burden to demonstrate an expert should have been appointed, and the military judge did not err in denying his request.

## C. Delay in Appellate Review

Appellant's case was docketed with this court on 4 February 2019, and Appellant filed his initial assignments of error 172 days later on 26 July 2019 after requesting and receiving three enlargements of time over the Government's objection. The Government filed its answer 32 days later on 27 August 2019.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J.

239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to a timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

This case exceeded the 18-month standard between docketing and appellate decision by approximately two weeks. With respect to exceeding the 18-month standard for producing this opinion, we note the record of trial is lengthy, including over 860 pages of transcript and 23 appellate exhibits. In addition, Appellant took nearly six months to file his assignments of error after requesting three enlargements of time. We are affirming the findings and sentence in Appellant's case, and Appellant remains in confinement.

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted). Appellant has not demonstrated any oppressive incarceration, and his appeal has not resulted in any reduction in his sentence. He has not alleged any particularized anxiety or concern. Since we are not returning his case for a rehearing, his ability to present a defense at such a rehearing is not impacted. Finding no qualifying prejudice from the delay, we also conclude there is no due process violation, as the delay is not so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court